UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

GEORGE T. KELLY, III, individually and on
behalf of all others similarly situated,

                  Plaintiff,

    v.

THE ALIERA COMPANIES, INC., formerly
known as Aliera Healthcare, Inc., a Delaware
corporation; and TRINITY HEALTHSHARE,
INC., a Delaware corporation,

                Defendants.

Civil Action No. _____

## **CLASS ACTION COMPLAINT**

1.     Plaintiff GEORGE T. KELLY, III is a citizen of Missouri who resides in Neosho, Newton County.  Mr. Kelly was enrolled in a health care plan from defendants Aliera Healthcare and/or Trinity Healthshare from November 1, 2018 through December 31, 2019.

2.     Defendant THE ALIERA COMPANIES, INC. ("Aliera") is a Delaware corporation headquartered in Atlanta, Georgia.  It is incorporated as a for-profit business, without any express religious affiliation.  It changed its name in 2019 from Aliera Healthcare, Inc.

3.     Defendant TRINITY HEALTHSHARE, INC. ("Trinity") is a Delaware corporation headquartered in Atlanta, Georgia and purports to be a nonprofit entity.  Trinity was incorporated on or about June 27, 2018.  Aliera and Trinity are collectively referred to as "Defendants."

4. Aliera markets, sells, and administers health insurance plans for Trinity and is solely responsible for the development of plan designs, pricing, marketing materials, vendor management, recruitment and maintenance of a sales force on behalf of Trinity.

5. Neither Aliera nor Trinity holds a certificate of authority from the Director of the Department of Financial Institutions and Professional Registration, as required by §§ 375.161 and 375.786 R.S.Mo., and neither is authorized or licensed to provide any type of insurance plan in Missouri.

## I. JURISDICTION AND VENUE

6. Jurisdiction of this Court arises pursuant to 28 U.S.C. § 1332(a) and § 1367 because there is diversity of citizenship and the amount in controversy related to the proposed class claims exceeds $75,000.

7. Venue is proper because some of the acts or omissions occurred in the Western District of Missouri, and the named Plaintiff and many of the proposed class members reside in the District.

## II. NATURE OF THE CASE

8. Defendants sold inherently unfair and deceptive health care plans to Missouri residents, and failed to provide them with the coverage the purchasers believed they would receive. Defendants claimed the health care plans were not "insurance" in order to avoid both oversight by the state insurance commissioner and the minimum requirements mandated by the Patient Protection and Affordable Care Act ("ACA"). At the same time, Defendants created the health care plans to look and feel like health insurance that would provide meaningful coverage for the purchasers' health care needs.

9. When Congress passed the ACA in 2010, it required all individuals to be covered by health insurance or pay a penalty. Congress allowed for a handful of exceptions to that

requirement, set out in 26 U.S.C. § 5000A. One of those exceptions was for members of existing Health Care Sharing Ministries ("HSCMs"). In order to qualify as an HSCM under the ACA, an entity must meet rigid requirements, including: (1) it must be recognized as a 501(c)(3) tax exempt organization; (2) its members must "share a common set of ethical or religious beliefs and share medical expenses among members according to those beliefs;" and (3) it must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(ii).

10. Defendants, in an attempt to inappropriately exploit this exception, falsely represented that Trinity has been "recognized" as an HCSM. Trinity did not meet the requirements of 26 U.S.C. § 5000A(d)(2)(B)(ii) because it was not in existence until 2018, and because it did not require its members to adhere to its stated ethical or religious beliefs. It was never, and could not have been, "recognized" as an HCSM because the federal agency that had at one time provided letters of recognition stopped doing so in 2016, before Trinity was created.

11. The State of Missouri exempts HCSMs from regulation under Missouri insurance law. § 376.1750 R.S.Mo. In order to qualify as an HCSM under Missouri statute, an entity must meet additional requirements. It must (a) limit its membership to those of a similar faith; (b) act as an organizational clearinghouse for information between members; (c) provide for the financial or medical needs of a member through gifts directly from one member to another, or by establishing a trust solely for the benefit of members; (d) provide amounts members may give with no assumption of risk or promise to pay either among the members or between the members and the organization; and (e) provide a written monthly statement to all members, listing the total dollar

amount of qualified needs submitted to the organization, and the amount actually published or assigned to members for voluntary payment.

12.     Trinity met none of these requirements and does not qualify as an HCSM under Missouri law.  It did not limit its membership to those of similar faith; it never acted as a "clearinghouse for information between members;" it never provided members an opportunity to share directly with other members or established a trust for the benefit of members; it never gave members the choice to apply "contributions" to other members' needs, but instead siphoned off members' payments to exorbitant and undisclosed fees and commissions; and it never provided members with a written monthly statement listing dollar amounts of needs submitted or actually assigned to members.

13.     While falsely representing that Trinity is a recognized HCSM, Defendants sought to avoid state insurance protection statutes by claiming the products they sell are not "insurance." In fact, Aliera, using Trinity as a purported HCSM, created, marketed, sold, and administered plans to citizens in Missouri.  These plans qualify as health insurance under Missouri law, § 376.960(12) R.S.Mo., and are illegal and unauthorized health insurance products.  They were sold to Missouri residents without a certificate of authority from the Director of the Department of Financial Institutions and Professional Registration, in violation of §§ 375.161 and 375.786 R.S.Mo.  They are illegal contracts.

14.     By avoiding regulation, they have avoided requirements to maintain the reserves necessary to pay all claims, and to maintain a surplus which provides an additional cushion in the event of an unanticipated event or health crisis, such as a pandemic.

15.     On information and belief, Defendants sold their illegal health insurance plans to hundreds, if not thousands, of Missouri residents.  These plans did not comply with the minimum

basic requirements for authorized health care plans under state or federal law, and have resulted in Missouri residents (1) paying for an illegal contract, and (2) being denied coverage for medical care required by law to be provided.

16.     Aliera and its owners, however, have realized exorbitant profits while refusing to pay members' claims.  On information and belief, Defendants have deducted fees, commissions, and other expenses that are so extraordinary that only 8.3% - 35% of the amount members pay Defendants for medical coverage is left for paying members' claims.

17.     Defendants' representations that the insurance plans were HCSM plans were misleading, unfair and/or deceptive.  At no relevant time did the Defendants' plans meet the requirements for HCSMs under federal law or Missouri law.  They created and marketed the plans to look and feel like insurance plans, and sold and administered the plans with the intention of securing their own profits by arbitrarily delaying and denying claims that their members would reasonably expect to be paid, and leaving members with no effective recourse.

18.     Plaintiff, on behalf of the class he seeks to represent, files this lawsuit to obtain declaratory and injunctive relief to prevent Defendants from continuing to create, market, sell, and administer unauthorized and illegal health insurance plans in Missouri.  On behalf of the proposed class and on his own behalf, Plaintiff also seeks rescission of his plans and reimbursement of the payments he made, or damages related to uncovered health care expenses, premiums paid and other losses due to Defendants' creation, marketing, sale, and administration of unauthorized and illegal health insurance plans.

19.     Plaintiff also seeks damages, punitive damages, attorney fees and declarative and injunctive relief under the Missouri Merchandising Practices Act, § 407.010, *et seq.* ("MMPA"). Defendants have deceived members into purchasing the health plans by misrepresenting that the

plans, like insurance, would cover them for listed perils and would be administered in the best interest of the members.

20.    Plaintiff, on behalf of the class he seeks to represent, also seeks restitution and imposition of a constructive trust. Defendants breached their fiduciary duties to class members and have been unjustly enriched. They have refused to pay legitimate claims, and have unreasonably profited from class members whose payments were made on the reasonable belief, based on Defendants' representations, that their medical expenses would be covered.

## III. CLASS ALLEGATIONS

21.    *Definition of Class:* Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action on behalf of himself and all persons similarly situated. The proposed Class is defined as follows:

> All Missouri residents who purchased a plan from any of Defendants or their subsidiaries that purported to be a "health care sharing ministry" plan at any time since June 27, 2018.

22.    *Size of the Class:* The Plaintiff's proposed class is so numerous that joinder of all members is impracticable. On information and belief, hundreds, if not thousands, of individuals in Missouri are covered by Defendants' plans.

23.    *Common Questions of Fact and Law:* There are questions of law and fact that are common to all class members including: (1) whether the healthcare products that the Defendants created, marketed, sold, and administered to class members met the legal requirements of an HCSM under 26 U.S.C. § 5000A; (2) whether those health care plans met the definition of an HCSM under § 376.1750 R.S.Mo.; (3) whether plans sold were "insurance" under Missouri insurance law; (4) whether Missouri insurance law and regulations forbid the creation, marketing, sale, and administration of health care products in the "business of insurance" without authorization or other legal exception; (5) whether Defendants failed to obtain proper authorization for the creation, marketing, sale, and administration of an insurance product in Missouri;

(6) whether class members are entitled to (a) rescission of the plan(s) and refunds of all premiums paid and/or (b) reformation of the plans to comply with legally required minimum insurance coverage, and re-processing of all claims for expenses and costs incurred that would have been covered had the plan(s) properly complied with legal coverage requirements; (7) whether Defendants engaged in deceptive, fraudulent, or unfair practice in connection with the marketing, sale, and administration of health care plans sold to Missouri residents; (8) whether Defendants owed a fiduciary duty to their members, and whether they breached that fiduciary duty; (9) whether Defendants have been unjustly enriched by failing to pay claims and unjustly received profits should be disgorged; (10) whether a constructive trust should be imposed; and (11) whether punitive damages resulting from Defendants' unfair and/or deceptive acts should be awarded.

24.     ***Class Representative.***  The claims of the named Plaintiff are typical of the claims of the proposed class as a whole resulting from Defendants' sale of unauthorized and illegal insurance plans.  The named Plaintiff will fairly represent and adequately protect the interests of the class members because he has been subjected to the same practices as other class members and suffered similar injuries.  The named Plaintiff does not have interests antagonistic to those of other class members as to the issues in this lawsuit.

25.     ***Separate Suits Would Create Risk of Varying Conduct Requirements***.   The prosecution of separate actions by class members against Aliera and/or Trinity would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct.  Certification is therefore proper under Fed. R. Civ. P. 23(b)(1).

26.     ***Defendants Have Acted on Grounds Generally Applicable to the Class.*** Defendants Aliera and Trinity have uniformly created, marketed, sold, and administered

unauthorized health insurance plans in Missouri. They have misrepresented the plans as HCSM plans under federal and state law. Defendants have acted on grounds generally applicable to the proposed class, rendering declaratory and injunctive relief appropriate respecting the whole class. Certification is therefore proper under Fed. R. Civ. P. 23(b)(2).

27. ***Questions of Law and Fact Common to the Class Predominate Over Individual Issues.*** The claims of the individual class members are more efficiently adjudicated on a class-wide basis. Any interest that individual members of the class may have in individually controlling the prosecution of separate actions is outweighed by the efficiency of the class action mechanism. Upon information and belief, no class action suit is presently filed or pending against Aliera and/or Trinity for the relief requested in this action. Issues as to Aliera's and/or Trinity's conduct in applying standard plan designs, marketing, sales, and administration practices towards all members of the class predominate over questions, if any, unique to members of the class. All members of the class are or were at the time of coverage residents of Missouri, and the same state law applies to all claims and are subject to the same common proof and use of expert and factual testimony Certification is therefore additionally proper under Fed. R. Civ. P. 23(b)(3).

28. ***Venue***. This action can be most efficiently prosecuted as a class action in this jurisdiction, where Defendants do business and where Plaintiff resides.

29. ***Class Counsel***. Named Plaintiff has retained experienced and competent class counsel, including attorney Jay Angoff, who served as Director of the Missouri Department of Insurance from February 1993 to October 1998.

## IV. FACTUAL BACKGROUND

### *Aliera Seeks Out an HCSM to Avoid Insurance Requirements, But its First Relationship Ends in Litigation*

30.     Defendant Aliera was incorporated in the State of Delaware by Timothy Moses, a convicted felon, his wife Shelley Steele, and their son Chase Moses, in December 2015.  Before forming Aliera, Timothy Moses was the president and CEO of International BioChemical Industries, Inc., a company that declared bankruptcy in 2004 after he was charged with felony securities fraud and perjury.  As a result of the case, titled *United States v. Moses*, 1:04-cr-00508-CAP-JMF (N.D. Ga.), Moses was sentenced to over 6 years in prison, and ordered to pay $1.65 million in restitution.

31.     Aliera is a for-profit entity.  Its stated scope of business is "to engage in the business of providing all models of Health Care to the general public" and "to cultivate, generate or otherwise engage in the development of ideas or other businesses.  To buy, own or acquire other businesses, to market and in any way improve the commercial application to the betterment and pecuniary gain of the corporation and its stockholders..."  Aliera's formation documents do not include any discussion of religious or ethical purposes or missions.

32.     Aliera began selling its healthcare products in late 2015.  At the time it was formed, it only sold "direct primary care medical home (DPCMH)" plans.  DCPMH plans generally cover limited services such as some doctors' visits and basic lab services.  These plans provide no hospitalization or emergency room coverage and are not ACA-compliant.

33.     Aliera realized it could greatly increase the sales of its healthcare products if it could take advantage of the federal statute that exempted taxpayers who purchased HCSMs from the ACA's individual mandate.  Aliera believed it could also avoid insurance laws in many states,

including Missouri, that have an exemption from insurance regulations for entities that meet the state's HCSM requirements.

34.    Non-party Anabaptist Healthshare ("Anabaptist") was a small Mennonite entity located in Virginia. Anabaptist had been recognized by the federal Department of Health & Human Services' Centers for Medicare & Medicaid Services ("CMS") as an HCSM that had met the requirements under 26 U.S.C. § 5000A.

35.    In 2016, Timothy Moses convinced Anabaptist to permit Aliera to market its DCPMH plan "side by side" with Anabaptist's sharing program using Anabaptist's HCSM designation. Anabaptist created a wholly-owned subsidiary, called Unity Healthshare ("Unity"), for that purpose. Under the proposal, Aliera would market both its own plan and the Unity HCSM together as a healthcare product it claimed would be an HCSM.

36.    Aliera entered into a contract with Unity on or about February 1, 2017. Under that contract, Aliera would offer its own health care products to the public that did not meet the insurance benefits and coverages requirements under the ACA, and that did not independently qualify for the HCSM exemption in 26 U.S.C. § 5000A. In return, Aliera's customers would join the Unity HCSM, increasing members to Anabaptist's HCSM. Under the contract with Unity, Aliera was responsible for maintaining and segregating the assets received that were reserved for payment of benefits to Unity members.

37.    Although Aliera marketed the plans to consumers throughout the country as HCSM plans through Unity, in reality, Unity was merely a shell with an HCSM designation, through which Aliera, a for-profit entity that was never an HCSM, could push its own DCPMH plans, while also designing, marketing, selling, administering, and controlling the Unity-branded HCSM plans.

38.     In 2018, after thousands of Aliera/Unity plans had been sold nationwide, Anabaptist/Unity discovered that Mr. Moses had written himself approximately $150,000 worth of checks from Unity funds without board approval and had not properly maintained assets reserved for payment of benefits.  It requested an accounting and, in July 2018, demanded Aliera turn over control of all Unity funds.

39.     Unity terminated the relationship with Aliera in summer, 2018.   A lawsuit between Aliera and Anabaptist Health Share/Unity was filed in Superior Court of Fulton County Georgia in late 2018.  *See Aliera Healthcare v. Anabaptist Health Share et al.,* No. 2018-cv-308981 (Hon. Alice D. Bonner, Ga. Sup. Ct.).  The court found that administrative fees paid to Aliera under its agreement with Unity amounted to millions of dollars.  *Appendix A.*

### Aliera Created Trinity as a Sham Health Care Sharing Ministry to Avoid ACA Requirements and State Insurance Regulation

40.     With its relationship with Unity terminating, Aliera would have no affiliation with any HCSM through which to sell its health care plans.  Trinity was therefore created by Aliera and its principals on June 27, 2018 as a purported nonprofit entity.  William Rip Theede, III was the CEO of Trinity.  Mr. Theede is a former Aliera employee.  He is also a close family friend of the Moses family and officiated at Chase Moses' wedding.

41.     Trinity could not qualify as an HCSM because it was created after December 31, 1999, and at the time of its creation in 2018, had no members.  In order to qualify as an HCSM under federal law, the entity or a predecessor of the entity must, among other requirements, have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(IV).  Trinity has not had members who have shared medical expenses

"continuously and without interruptions since at least December 31, 1999," and it had no predecessor entity.

42. In addition, in order to qualify as an HCSM under federal law, the members of the entity must "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs…." 26 U.S.C. § 5000A(d)(2)(B)(III). Although Trinity's bylaws set forth a specific set of Protestant Christian religious beliefs, it has never restricted its membership to those individuals who affirm the specific common beliefs. Members are only asked to affirm a generic "Statement of Beliefs" that refers to no particular religion. *See Appendix B,* p. 10. As stated in "frequently asked questions" on Defendants website, "Trinity HealthShare welcomes members of all faiths who can honor the Statement of Beliefs, by which the Trinity HealthShare program operates." *Appendix D,* p. 11. As a practical matter, the generic Statement of Beliefs allows sale of the health care products to the general public.

43. While prospective agents must take a training assessment, the questions asked in the assessment do not address any religious or ethical motivation. Defendants' advertisements for prospective agents, and the training materials for agents do not mention a religious or ethical component for purchasers of these plans. In a video posted to YouTube dated November 1, 2018, an unidentified Aliera trainer for new or prospective agents discussed the Aliera Healthcare Enrollment Process. The training explains what the "statement of faith" means:

> It basically is saying that you believe in a higher power. It doesn't necessarily have to be a Christian God, or a Buddhist God, or a Jewish God. It doesn't … matter as long as we all believe that there is a higher power and we're all living our life that the best way that we possibly can. We're maintaining a healthy lifestyle. We're trying to avoid those types of foods, behaviors, habits - things that, you know, cause us illness that are in our control.
>
> As long as we're doing those types of things, we're all like-minded individuals. So if you feel that way, and you are a like-minded individual, that's all we're trying to find out. And, if you are, you're

gonna say, "Yes," you believe in the five same statement of beliefs that we all do.

44.     Defendants represent that Trinity is "recognized" as a qualified HCSM.  *See Appendix E.*  It was, in fact, impossible for Trinity to be "recognized" as such because the rule that provided such recognition was eliminated years before Trinity was even created.  In 2013, the United States Department of Health and Human Services ("HHS") promulgated a rule under which it certified HCSMs by issuing a certificate of exemption to the entity.  However, the rule was eliminated in 2016.  *See* 81 Fed. Reg. 12281 (final rule eliminates the issuance of exemptions for HCSMs).  Trinity has never appeared on any list of recognized HCSMs developed by HHS.

45.     Likewise, the Internal Revenue Service ("IRS") does not and has never recognized any entities as HCSMs.  Its role is limited to accepting tax returns from individuals who may claim that they are entitled to an HCSM exemption on their individual tax returns.  Individual taxpayers, in turn, rely on representations of the health plan in determining whether they are enrolled in an HCSM.  The IRS has never recognized Defendants as a qualified HCSM under 26 U.S.C. § 5000A(d)(2)(B).  Defendants' representations to the contrary are false.

46.     On or about August 13, 2018, Aliera signed an Agreement with Trinity to provide the marketing, sale, and administration of the purported HCSM plans they created.  The Agreement allowed Aliera to use Trinity's non-profit status to sell health care plans purporting to be HCSM plans, while keeping complete control over design of the plans, the money collected, the administration of the plans, the benefits paid, and the membership roster.  Under the Agreement, Trinity delegated to Aliera authority to provide accounting staff, financial and membership reporting, and audit and tax filing support.  The Agreement provides that all member "contributions" payments are made directly to Aliera, which then allocates 30-40% (depending on the plan) of every payment to commissions, and that Aliera will be paid substantial additional

administrative fees.  Only a small fraction of the amount of a member contribution (as little as 8.3% of the contribution amount for one of the plans class plaintiff here purchased, according to the Agreement) is actually placed into a Trinity "Sharebox" account for payment of claims.

### The Products Defendants Create, Market, Sell, and Administer are Health Insurance

47.    During certain times on and after June 27, 2018, when Defendant Trinity was incorporated, Plaintiff and members of the class have been, are, or will be enrolled in healthcare products created, marketed, sold, and administered by Defendants that Defendants claimed were HCSM plans.  The products were created to look and feel like and convey the impression that they are equivalent to insurance.

48.    The terminology Defendants use in connection with their plans is directly analogous to terminology health insurers use.  Hence:

(a)    The products are described as health "plans," which is the same term the ACA uses to describe health insurance.

(b)    The healthcare products marketed, sold, and administered charge "members" a "monthly contribution" to participate.  Defendants described the "contributions" members pay as "premiums."  *See, e.g., Appendix D,* pp. 3-4.  The amount of the premium charged is based on the plan selected by the insured.  *Id.,* p. 1.

(c)    The plans require a member to pay a deductible, which Defendants call a "Member Shared Responsibility Amount," or "MSRA."  *Id.,* p. 4.  The higher a member's MSRA, the lower the member's "contribution."

(d)    Once the MSRA has been paid, then medical bills are paid in accordance with a benefits booklet or "Member Guide" for the selected program.  These benefit booklets

contain the "membership instructions" which detail the "eligible medical expenses," "limits of sharing," and exclusions.

(e)     Like health insurance, the plans use terminology like "pre-authorization," "in-network," "preferred provider network (PPO)," "cost-sharing," and "medically necessary." *See, e.g., Appendix B.*

(f)     Defendants offer different health plans, with different levels of coverage, including "Basic," "Catastrophic," "Standard," and "Comprehensive." *See Appendix D,* p. 3-4. The amount members are expected to pay depends on the plan chosen.

(g)     The standard and comprehensive plans are offered at different benefit levels. "Standard" is offered at "Value," "Plus" and "Premium." "Comprehensive" is offered at "Bronze," "Silver," and "Gold." The programs at the higher levels charge more and therefore provide more robust benefits for covered medical conditions. *Appendix D,* p. 27.

(h)     The plans may require members to pay a "co-expense," analogous to a "copay." *Appendix D,* p. 4.

(i)     The plans provide for "maximum out of pocket" expenses. *Id.*

49.     Defendants describe the health plans as providing coverage for medical expenses that only insurance can provide. Among other things, the plans claim to provide coverage for preventive care, primary care, urgent care, labs and diagnostics, x-rays, prescription benefits, specialty care, surgery, hospitalization, and emergency room services. *Appendix C,* p. 1; *Appendix F,* p. 4.

50.     The programs contain exclusions and lifetime limits, including a lower lifetime limit for cancer treatment.

51.     Members receive a card which is indistinguishable from an insurance card, and they are advised to keep it with them at all times to present to health care providers. *Appendix E.*

52.     Health care providers bill Defendants directly, just as they bill insurance companies.

53.     Defendants claim they will make payments directly to health care providers on behalf of members who are current on their monthly premiums in the event they experience a covered loss, have met their deductible or MSRA, and otherwise meet the coverage requirements set forth in the coverage booklet. These payments are expressly contingent upon the occurrence of a covered medical need by the participating member.

54.     Like insureds in traditional health plans, members receive an "Explanation of Benefits (EOB)" when a claim is submitted. The EOBs are identical in all material respects to EOBs received from traditional health plans, warn that filing false claims to an insurer is a fraud, and refer members to the Missouri Department of Insurance for consumer assistance if they suspect fraud. *Appendix G.*

55.     The health care plans are sold by insurance agents or brokers who are provided sell sheets that emphasize the "wide range of medical services eligible for cost sharing" that traditional health insurance plans would cover. *Appendix F,* pp. 2,4.

56.     Although Defendants claim Trinity administers "voluntary sharing of healthcare needs for qualifying members," *Appendix B,* p. 7, there is nothing voluntary about the insurance plans Defendants market, sell, and administer. Payment from the program upon the occurrence of a covered loss is determined exclusively by Defendants, purportedly according to the terms in the Member Guide. Members do not decide who gets paid benefits. Instead, according to the Member Guide, the members must accept Trinity's adjudication of benefits: "The contributors instruct

[Trinity] to share clearinghouse funds in accordance with the membership instructions …" "By participation in the membership, the member accepts these conditions." *Id.*, p. 13. The members have no input into the "membership instructions." According to the benefits booklet, Trinity, and not the members, is the "final authority for the interpretation" of the membership instructions, and Trinity directs payment to providers on behalf of members who have submitted medical claims that are covered under the benefits booklet. *Id.*

57. Members' "contributions" (i.e. premiums) are not refundable. Although the member "contributions" are called "voluntary," if members fail to make the premium payment, they are not entitled to coverage for medical expenses. *Id.*, pp. 8-9.

58. Defendants' programs are contracts whereby for a stipulated consideration, Defendants undertake to indemnify a member against loss by specified contingency. Defendants sell hospital and medical expense incurred health care service plans for the provision of healthcare benefits and constitute "health insurance" as defined by Missouri law. *See* § 376.960(12) R.S.Mo. Defendants are required to comply with Missouri and federal law governing health insurance. Defendants' products do not meet the exemption from the Missouri insurance statutes provided for legitimate HCSMs in § 376.1750 R.S.Mo. In particular:

(a) Defendants do not limit membership to those of a similar faith. *See* ¶¶ 42-43, above.

(b) Trinity, the entity that claims to be an HCSM, does not act as a "clearinghouse" between members. In fact, all coverage decisions and payments are made by for-profit Aliera.

(c)     Defendants do not provide for the financial or medical needs of its members through gifts directly from one member to another, nor has Trinity established a trust solely for the benefit of its members.

(d)     Defendants do not provide members any choice regarding amounts they may give, and in fact give members no choice as to what portion may be used to pay the claims of others and what portion goes to exorbitant fees taken by Aliera.

(e)     Defendants do not provide members with a written monthly statement listing the total dollar amount of qualified needs submitted and the amounts actually assigned for payment.

### The Health Insurance Plans Defendants Create, Market, Sell, and Administer Are Illegal

59.     Defendants do not have a certificate of authority as required by § 375.161 and § 375.786 R.S.Mo. from the State of Missouri to issue insurance within this state and are not authorized insurers under Missouri law.   Defendants have issued illegal and unauthorized insurance products to Plaintiff and other members of the class.

60.     Defendants' plans are not ACA-compliant because they do not meet the minimum coverage requirements under the ACA's Essential Health Benefits.   For example, the policies impose a 24-month waiting period on coverage for pre-existing conditions, which is illegal under the ACA.  *See* 42 U.S.C. § 300gg-3.

61.     The plans purport to require binding arbitration, which is invalid in Missouri insurance contracts and is against public policy.

62.     Defendants fail to maintain the 80% medical loss ratio required under the ACA, 42 U.S.C. § 300gg-18.  Instead, under its Agreement with Trinity, Aliera allocates only between 8.3% and 35% of member contributions to "Sharebox" payments to members.

63. The Member Guide, which has never been submitted to or reviewed or approved by the insurance commissioner, contains inconsistent and contradictory coverage terms and conditions. For example:

(a) The Member Guide claims the plans "meet the ACA requirement for providing Minimum Essential Coverage when offered … in conjunction with a Healthcare Sharing Ministry (HCSM)." *Appendix C,* pp. 2, 13. The plans then purport to exempt coverages required under the ACA, including, *e.g.*, coverage for pre-existing conditions and for mental health and substance use disorders.

(b) Defendants provide lists of in-network preferred providers whose charges they will cover, but then rely on inconsistent lists that do not include those providers.

(c) The Member Guide provides the amounts and types of benefits that are covered, but then suggest Defendants are not required to pay any benefits whatsoever, and provides members with no basis to enforce Defendants' promises, even after the members have paid all required "contributions."

(d) The Member Guide states the plan is an "opportunity for members to care for one another in a time of need, [and] to present their medical needs to other members," but in fact Defendants—like an insurance carrier—make all coverage decisions without ever presenting one member's needs to other members.

### Multiple States Have Found that Aliera and Trinity Are Illegally Marketing, Selling and Administering Insurance Products That Do Not Qualify as HCSMs

64. Multiple state regulatory actions have been taken against Aliera and Trinity with findings that the health plans they sold were unlicensed insurance, and/or that Trinity was not an HCSM. *See Appendix I.* These actions include:

(a) **Texas** – The Texas Attorney General filed suit against Aliera, claiming it engaged in the business of insurance without a license, and the court entered a TRO on July 12, 2019, prohibiting it from accepting new customers in Texas. The Texas Attorney General argued Aliera engaged in business of insurance without a license, and is "no ministry" but is "a multi-million dollar for profit business that admittedly siphons off over 70% of every dollar collected from its members to 'administrative costs.'" Aliera later agreed to accept no new customers in Texas during the pendency of the lawsuit.

(b) **Washington** – The Insurance Commissioner entered cease and desist orders against Aliera and Trinity on May 3, 2019, finding Aliera acted as an unlicensed healthcare service contractor and Trinity was not an HCSM. Trinity entered into a consent order on December 30, 2019, agreeing not to enroll any new Washington residents, and to pay a $150,000 fine.

(c) **Colorado** – The Colorado Division of Insurance found Defendants sold unauthorized insurance products and issued cease and desist orders on August 12, 2019. Final Agency Orders dated January 17, 2020, prohibit the sale of Aliera HCSMs in Colorado, and prohibit Trinity from doing business in Colorado.

(d) **New Hampshire** – The Insurance Commissioner entered a Cease and Desist Order on October 30, 2019 against Aliera and Trinity, prohibiting the sale or renewal of illegal health insurance in New Hampshire.

(e) **Connecticut** – The Insurance Department issued a Cease and Desist Order against Aliera and Trinity on December 2, 2019, finding they were acting as insurers in Connecticut without a certificate of authority.

(f)     *Maryland* – On February 27, 2020, the Insurance Commissioner entered an Order revoking Aliera's insurance producer license because it violated a 2018 consent order not to solicit membership in unauthorized insurance plans.

(g)     *California* – The Insurance Commissioner issued a Cease and Desist Order against Trinity and Aliera on March 8, 2020, finding that Trinity did not meet the definition of an HCSM, that they were acting as insurers in California without a certificate of authority, and that they made misleading advertisements to California consumers.

### *Plaintiff Was Sold Sham Products by Aliera/Trinity That Did Not Provide the Benefits Promised*

65.     Plaintiff Kelly enrolled in AlieraCare effective November 1, 2018.  He purchased two plans that were represented to be complementary:  "PrimaCare Basic," which purported to cover him for doctor visits, primary care, preventive care, labs and diagnostics, telemedicine and urgent care; and "CarePlus Advantage," a catastrophic plan that purported to cover ambulance, emergency care, cancer coverage, hospitalization, specialty care, surgery, diagnostic labs and pathology, and other benefits.

66.     Before purchasing the plans, Defendants, through their agent, assured Plaintiff that Freeman Hospital, the only hospital in his Neosho, Missouri community, and Freeman Health Systems, the providers affiliated with that Hospital, were in-network providers on the plans he was purchasing, and care received at Freeman Hospital and by doctors in the Freeman Health Systems would be covered.

67.     Plaintiff paid $344.44 ($195.44 for the CarePlus plan and $149 for the PrimaCare plan) as his "contribution" each month beginning October 30, 2018 through November 30, 2019. He also paid a one-time enrollment fee of $100 for the CarePlus plan and a $30 enrollment fee for the PrimaCare plan on October 30, 2018.

68.     After he enrolled and made the initial payments, Plaintiff received a Member Guide for both the PrimaCare Basic and CarePlus Advantage plans. *Appendices B and C.* He also received what he believed were insurance cards from Aliera/Trinity, together with a "Welcome" letter. *See Appendix E.* The insurance cards falsely stated that he was a "member of a HealthCare Sharing Ministry recognized pursuant to 26 U.S.C. § 5000A(d)(2)(B)," even though neither Trinity nor Aliera was ever certified or "recognized" by any government agency as an HCSM.

69.     The plans sold to Plaintiff were insurance under Missouri law and were not exempt from Missouri insurance law under § 376.1750 R.S.Mo. However, Defendants failed to comply with Missouri and federal insurance law in their provision of benefits.

70.     In February 2019, Plaintiff incurred $1,252 of medical costs that were identified as covered in the PrimaCare Member Guide. Defendants refused to pay any part of the claim, claiming the Plan "does not provide shared amounts for this service, supply, or equipment." *Appendix G.*

71.     In March 2019, Plaintiff received services from Dr. Donald Wonder and was billed $471.00. Defendants refused to pay any part of the claim, stating that the "Plan does not provide shared amounts for this type of provider." *Appendix G.* Dr. Wonder was listed as an in-network provider under the CarePlus Advantage Plan.

72.     In November 2018, Plaintiff was advised that he needed surgery. He sought preauthorization from Defendants to have the surgery performed at Freeman Hospital with physicians affiliated with the Freeman Health Systems. These providers were listed as in-network providers in the CarePlus PHCS network. Nevertheless, despite repeated attempts to obtain the preauthorization, Defendants denied the pre-authorization, claiming these providers were not in the network. *Appendix H.* Plaintiff contacted Defendants or their agent numerous times in an

attempt to contest Defendants' failure to authorize the surgery, was given different responses at different times, and ultimately was unsuccessful in obtaining authorization for the surgery.

73.     As a result, Plaintiff was forced to go outside of Missouri and to pay out-of-pocket for the surgery.

74.     Plaintiff believed any further appeal of Defendants' adverse coverage decisions would be futile, and canceled his plans, effective December 30, 2019.

## V.     CLAIMS FOR RELIEF

### A.     First Claim: Illegal Contract

75.     Plaintiff realleges all prior allegations as though fully stated herein.

76.     Defendants sold Plaintiff and all members of the proposed class unauthorized and illegal health insurance plans in violation of Missouri law:

(a)     The plans are insurance under Missouri law (*see* ¶¶ 47 - 58 above), but were sold without authorization.

(b)     The plans fail to provide the essential health benefits, exclude coverage for pre-existing conditions and impose waiting periods, and impose lifetime caps on coverage, all in violation of the ACA.

(c)     The Member Guides contain inconsistent and contradictory coverage terms and conditions that allow Defendants to arbitrarily deny coverage.

(d)     The plans include a binding arbitration procedure illegal under Missouri law.  The appeal and arbitration procedures are unconscionable and designed to arbitrarily delay payment and to leave members without a meaningful method of contesting coverage decisions.

(e)     Trinity fails to maintain the 80% medical loss ratio mandated by the ACA, and instead pays substantially more than 20% to Aliera in expenses, fees, and commissions.

77.     Plaintiff and all members of the proposed class are entitled to either (a) rescission of the illegal contract(s) and return of the insurance premiums paid; or (b) reformation of the illegal contract(s) to comply with the mandatory minimum benefits and coverage required under federal law.

**B.     Second Claim: Violation of Missouri Merchandising Practices Act**

78.     Plaintiff realleges all prior allegations as though fully stated herein.

79.     Defendants have engaged in unfair and deceptive acts and practices in violation of the Missouri Merchandising Practices Act., § 407.010, *et seq.* These unfair and deceptive acts include:

(a)     Defendants create their products to look and feel like traditional insurance and as a substitute for traditional insurance, and market and sell the products so as to deceive customers into believing that they will receive  health care benefits that are comparable to traditional health insurance. At the same time they create, market and sell their products as comparable to insurance, Defendants claim their products are "not insurance," so that they can avoid consumer protection and solvency regulation by the state Department of Insurance. Defendants hold no reserves or surplus as required of regulated insurers, and fail to inform those to whom they market that they hold no reserves or surplus.  By claiming their products are "not insurance," they also avoid providing the minimal Essential Health Benefits required under the ACA.

(b)     Defendants falsely advertise and misrepresent that Trinity is a "Health Care Sharing Ministry recognized pursuant to 26 U.S.C. § 5000A(d)(2)(B)."  This is false.  *See* ¶¶ 41-45 above.  The misrepresentation is the sole basis for claiming the plans they sell are "not insurance."  The misrepresentation deceived consumers  into believing that their healthcare plans

were faith-based and would be administered in an ethical manner for the benefit of members, rather than for the benefit of for-profit Aliera.

(c)     The health care plans are inherently unfair, deceptive, and illusory because, while representing to members which medical expenses are eligible for coverage, Defendant Aliera—to whom Trinity delegated all coverage decisions—retains discretion to interpret the plans and decide whether to approve or pay claims, and retains discretion whether to change the plans at any time.

(d)     Even though Defendants represent that the coverage provisions are not legally binding upon them and that they are not legally obligated to pay claims, they claim members are legally obligated to follow the  multilevel Dispute Resolution Procedure outlined in the Member Guides.  *Appendix B,* pp. 20-21.  This burdensome Procedure is not disclosed to consumers in the marketing materials before they commit to enrolling in the plans.  Defendants use the Procedure to subject members to Kafkaesque delays and false and inconsistent promises, and to require one-sided binding arbitration.  This Procedure is deceptively  administered to indefinitely delay payment of legitimate claims and shield Defendants from legal action, and is unfair and unconscionable.

(e)     Defendants misrepresent that members' monthly contributions are put into a cost-sharing account with Trinity, which acts as a "neutral clearing house between members." *Appendix B,* p. 3.  They misrepresent that Trinity "acts as an independent and neutral clearing house, dispersing [sic] monthly contributions as described in the membership instructions and guidelines."  *Id.*, p. 7.  Defendants misrepresent that Trinity, because it is a nonprofit with "nothing to gain or lose financially by determining if a need is eligible or not" is the entity to whom members delegated coverage decision authority.  *Id.,* p. 13.  In fact, contributions are not placed into a cost-

sharing account with Trinity. Under the Agreement between Trinity and Aliera, all member contributions are paid directly to for-profit Aliera which maintains complete control over payments for medical expenses and maintains complete and exclusive access to and control over the Trinity membership list. Defendants fail to disclose that only a fraction of the funds Aliera receives as member contributions are paid out in claims, or that for-profit Aliera takes the majority of member contributions as fees, leaving insufficient funds to pay member claims. They fail to disclose Aliera, which makes all coverage decisions, arbitrarily decides whether benefits should be approved or paid.

(f)     Defendants claim they have a "growing nationwide PPO network of more than 1,000,000 healthcare professionals and 6,000 facilities," and provide lists of those professionals and facilities, but then deny claims on the basis that those professionals and facilities are not in-network, or that the providers are charging too much.

(g)     Defendants misrepresent that the reason the plans are cheaper than ACA-compliant plans is that they have higher deductibles, or "MSRAs." *Appendix D,* at 26. Consumers purchase the plans on the reasonable belief that after they pay the higher deductible, they will be covered for their health care needs. In fact, the reason the plans are cheaper is that Defendant Aliera asserts the unilateral discretion to, and does, arbitrarily delay the payment of or deny claims, even after the MSRA (deductible) is met.

80.     Defendants misrepresent that the plans "meet the ACA requirement for providing Minimum Essential Coverage when offered … in conjunction with a Health Care Sharing Ministry (HCSM)." *Appendix C,* pp. 2, 13. It further suggests compliance with the ACA requirements by disclosing: "The ACA is subject to change at any time; [Defendants] reserve the right to adhere to those changes without notice to the Member." *Appendix B,* p. 23; *Appendix C,* p. 13. In fact,

the plans do not provide the Minimum Essential Coverage under the ACA. For example, they do not cover pre-existing conditions, and impose caps on benefits. These unfair and deceptive acts and misrepresentations have the capacity to deceive or mislead members of the class that they were purchasing a legitimate substitute for health insurance that would provide them with meaningful health care coverage.

81.     Defendants' misrepresentations and material omissions were intended to mislead and induce Plaintiff and the class into believing they were selling a legitimate health care product that provided more affordable coverage than traditional health insurance, and that Plaintiff and the class would receive coverage comparable to traditional plans.

82.     Plaintiff and the class purchased health plans through Defendants based on these unfair and deceptive acts, practices, and misrepresentations.

83.     Plaintiff and the class have been injured by paying premiums or contributions for worthless plans, and because their claims for medical coverage were improperly and arbitrarily denied. They have foregone or limited needed care due to illegal caps, exclusions and limitations under Defendants' plans.

## C.     Third Claim: Breach of Fiduciary Duty

84.     Plaintiff realleges all prior allegations as though fully stated herein.

85.     Defendants represent that members "voluntarily submit monthly contributions into a cost-sharing account," and that Trinity "acts as a neutral clearing house between members." *Appendix B*, p. 3. While disclaiming that there is any legally binding agreement to reimburse members for medical needs, Defendants claim Trinity will serve as "an independent and neutral clearing house, dispersing [sic] monthly contribution as described in the membership instructions and guidelines." *Id.*, p. 7.

86.     Defendants further represent their trustworthiness by claiming Trinity is a "religious organization," *Appendix C*, p. 15, is "faith based," and is based on a "religious tradition." *Appendix B*, pp. 3, 4.

87.     Defendants represent that "since Trinity HealthShare has nothing to gain or lose financially by determining if a need is eligible or not, the contributor designates Trinity HealthShare as the final authority for the interpretation of these guidelines." *Appendix B*, p. 13.

88.     Defendants represent that monthly marketing contributions are "voluntarily given" to Trinity "to hold as an escrow agent and to disburse according to the membership escrow instructions." *Id.*, p. 12.

89.     Defendants have complete control over the financial "contributions" members pay, and complete control over the coverage decisions.

90.     Based on these representations and their control over members' "contributions," Defendants have a fiduciary duty to the members.

91.     Defendant Aliera has also admitted in court filings in connection with the Georgia Litigation that it has a fiduciary duty to the members.

92.     Defendants have breached their fiduciary duty. Coverage decisions are made solely by the for-profit Aliera, and in order to secure its profits, not to provide coverage for members' medical needs. Plaintiff and the class members have been arbitrarily denied claims for medical expenses, and have been denied pre-authorization of needed medical care, in order to enrich Defendants.

93.     The majority of the member contributions are paid to Aliera in undisclosed fees, and not to cover the medical needs of the members.

94.     Defendants had a fiduciary duty to hold members' "contributions" in trust for the benefit of the members to pay their healthcare claims.  Defendants have failed to establish or hold the contributions in trust.

95.     Plaintiff and the member class have been injured by Defendants' breaches of fiduciary duty.  The funds that should have been used to pay their claims have instead been used to enrich Defendants.  The profits should be disgorged and held in constructive trust for the benefit of the Plaintiff and the class to pay their claims.

**D.     Fourth Claim: Unjust Enrichment**

96.     Plaintiff realleges all prior allegations as though fully stated herein.

97.     Plaintiff and the class paid substantial monthly contributions, the majority of which were siphoned off as fees to benefit Aliera.

98.     Plaintiff and the class made the payments with the understanding that the funds would be shared among the members to pay medical claims.  They were never advised that a majority of their payments would actually go to Aliera's fees.

99.     Aliera has retained the members' contributions while arbitrarily denying medical claims, and has been unjustly enriched at the expense of Plaintiff and the class.

100.    Plaintiff and the class are entitled to restitution of the amount Aliera unjustly retained.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

(a)     Certify that this action may proceed as a class action as defined in ¶ 21 above;

(b)     Designate Plaintiff George T. Kelly, III, as class representative and designate Richard E. Spoonemore, Eleanor Hamburger, and Ann E. Merryfield, Sirianni Youtz

Spoonemore Hamburger PLLC, Michael David Myers and Samantha Lin, Myers & Company PLLC, and Jay Angoff and Cyrus Mehri, Mehri & Skalet, PLLC, as class counsel;

(c)    Declare that Defendants' unauthorized health insurance plans were and are illegal contracts;

(d)    Enjoin Defendants from selling unauthorized, unfair, and deceptive health plans in Missouri and to provide court approved corrective information to all consumers in the state of Missouri;

(e)    Order Defendants to provide the written monthly statements listing the total dollar amount of qualified needs submitted to Trinity and the amount actually paid, to each Missouri member as required pursuant to § 376.1750.2(5) R.S. Mo.

(f)    Order Defendants to establish the trust solely for the benefit of members, as required pursuant to § 376.1750.2(3) R.S. Mo.

(g)    Order Defendants to (i) rescind the unauthorized health insurance plans and refund all premiums improperly received from members of the proposed class, including interest; or, at the option of any class member (ii) reform the unauthorized health insurance plans to comply with the minimum mandatory benefits required under the relevant state insurance code and federal law, and permit class members to submit claims for medical services, costs and other expenses that would have been covered if those minimum benefits had been provided;

(h)    Enter judgment for damages and punitive damages in favor of Plaintiff and the class on their MMPA claim in an amount to be proven at trial;

(i)    Enter judgment in favor of Plaintiff and the class on their breach of fiduciary duty claim, order Defendants to disgorge all sums received in violation of their fiduciary duty, and impose a constructive trust for the benefit of the class on all the amounts disgorged;

(j)     Order restitution of all contributions Aliera unjustly retained;

(k)     Order payment of reasonable attorneys' fees; and

(l)     Grant such other relief as this Court may deem just, equitable and proper.

DATED:  April 15, 2020.

_____/s/ Jay Angoff_____

Jay Angoff, MO Bar # 46415
Cyrus Mehri, *Pro Hac Vice Forthcoming*
MEHRI & SKALET, PLLC
1250 Connecticut Avenue, NW, Suite 300
Washington, DC 20036
Telephone: 202-822-5100
Email: jangoff@findjustice.com
Email: cmehri@findjustice.com

Michael David Myers, *Pro Hac Vice Forthcoming*
Samantha Lin, *Pro Hac Vice Forthcoming*
MYERS & COMPANY PLLC
1530 Eastlake Avenue East
Seattle, WA 98102
Tel. (206) 398-1188
Email:  mmyers@myers-company.com
Email:  slin@myers-company.com

Richard E. Spoonemore, *Pro Hac Vice Forthcoming*
Eleanor Hamburger, *Pro Hac Vice Forthcoming*
Ann E. Merryfield, *Pro Hac Vice Forthcoming*
SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 Western Avenue, Suite 350
Seattle, WA  98121
Tel.: (206) 223-0303
Email:  rspoonemore@sylaw.com
Email:  ehamburger@sylaw.com
Email:  amerryfield@sylaw.com

*Attorneys for Plaintiff*
